---

## THE DISA.

### (District Court, S. D. New York. April 12, 1907.)

**1. SHIPPING—CHARTER HIRE—TIME OF REDELIVERY.**

Where, at the time of an oral charter of a steamer to carry a cargo of fruit at a monthly hire, she had fittings for the cargo which had been left therein by a former charterer, and which, with some additions, were also left by the later charterer when she was redelivered, the owner is not entitled to recover hire thereafter during the time of a dispute as to the duty of the charterer to remove such fittings.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 194.]

**2. SAME—BREAKDOWN OF MACHINERY—LIABILITY FOR INCIDENTAL LOSS TO CHARTERER.**

Under a charter of a steamer to proceed to Cuba for a cargo of fruit, which exempted the owner from liability due to any accident to the machinery, his failure to promptly notify the charterer of a breakdown at sea which delayed arrival at the port of loading for several days, did not render him liable for a loss of bananas which had been cut in anticipation of her earlier arrival; there being no provision of the charter requiring such notice.

In Admiralty.

Wheeler, Cortis & Haight, for The Disa.
Hulbert & Webb, for respondent and cross libellant.

ADAMS, District Judge. The first of the above entitled actions, Rederiaktieb Disa against Miguel S. Arrue, was brought to recover the hire of the steamship Disa, owned by the former, from the 29th day of August, 1906, until such time as she should be duly redelivered to the libellant, which at the time of bringing this action, October 8, 1906, was claimed to be $1,334.40. This sum was reached by charging hire at the rate of £425 per month, the agreed rate, and crediting a payment of $1,004.87 on account, and an allowance of $752.62, for time lost by reason of her breakdown in the Atlantic Ocean en route to Cuba. There is no dispute about hire being due to October 1st. The libellant, however, claims that there was no redelivery of the steamer until October 17th and hire continued to that time.

The action was defended and a claim of $4,000 damages made in the 2nd above entitled action, Miguel S. Arrue against Rederiaktieb Disa, on the grounds: (1) that a former charterer for the same trade left a quantity of fittings on board, which were there when the respondent took her and were left in conformity with the custom of the fruit trade in which she was engaged; (2) that a contract provided for a charter upon the same terms and conditions as set forth between the libellant and the previous charterer, except that the respondent had the option of renewals for successive trips provided he should give notice at Baracoa, Cuba, before the steamer should sail from that port, and the hire was to be less 2½ per cent. address commission and should

not commence to run until the steamer should begin to take in coal, to be furnished by the respondent, at the port of New York, which was August 29, 1906, early in the morning and she sailed on that day about 11 o'clock in the forenoon; that on the following day the respondent paid to Bowring & Company, the agents of the steamer the said sum of $1,004.87 but the agents refused to sign a charter party in accordance with the terms of the agreement made between the respondent and the master of the vessel; (3) that on or about the 1st of September, 1906, when about 300 miles southeast from Wilmington, North Carolina, the machinery of the vessel broke down so that she was obliged to put into that port for repairs which detained her there about 13 days, when she proceeded on her way to Baracoa where she arrived on the 18th of September, was loaded with a fresh cargo of bananas and cocoanuts and set sail for New York on the 25th of September; that she arrived in New York and completed the discharge of her cargo by the 1st of October, and on that day was delivered, with said fittings on board, to the libellant who accepted the same; (4) that the libellant has failed to credit the respondent with the value of the coal used by the vessel during her breakdown amounting to $125; (5) that upon the departure of the vessel from New York, the respondent cabled advice to his representative in Baracoa that the vessel was expected to arrive at that port on Wednesday, September 5th; that at the time the respondent had two steamers under charter, which sailed from New York to Port Antonio, Jamaica, respectively the 30th and 31st of August and arrived September 6th and 7th and he also could have chartered a Munson Line steamer lying in a port near Baracoa at any time up to the 5th of September, but owing to the neglect of the libellant to immediately advise him of the Disa's breakdown, he was unable to utilize any of the steamers; that he did not receive any notice of the breakdown until September 6th, when it was too late to take any steps to save the cargo which had been cut and gathered for the Disa and the bananas became a total loss and the cocoanuts badly shrunk and damaged, whereby the respondent suffered to the extent of $4,000.

The contract here was made orally between the master of the vessel and the respondent who was engaged in the business of shipping fruit, principally bananas, from Cuba to New York. Up to the time of making the charter in question here, the steamer had been operated to and from the West Indies under a five months charter to a Mr. Cuneo at the rate of £425 per month. The new contract contemplated the same service at the same rate but for a shorter period and what that was to be is one of the controverted questions in the case. The libellant contends the agreement was for consecutive trips, while the respondent contends that it was for one round trip to Baracoa, with the option on his part for renewal as stated above (2).

The master testified in this connection:

"Q You have stated that the new charter was to be on these same general terms? A The same conditions, yes sir, only that Mr. Arrue said he would let me know in Cuba, when I was in Baracoa, if he wanted the ship the following trip; I should have that much time to get other freight.

"Q I don't understand exactly, captain, about the agreement with Mr. Ar-

rue; were you to receive notice in any event, whether he was or was not to use the boat? A He was to let me know if he wanted the boat.

"Q And if not? A He should let me know that he did want her, because that is just the question, I should know whether he did or not. I said there might be a telegram come while I was not there; I wanted him to let Bowrings know.

"Q I want to be clear in my mind; was Mr. Arrue to notify you providing he did want the ship, or providing he didn't want it, in any event? A As I understood, any how, whether he wanted it or not. I was afraid there would be a telegram come while I was gone and I said you had better notify Bowrings about that; I might not get it."

Mr. Arrue testified:

"Q Did you have any conversation with the captain about chartering his boat? A Yes sir.

"Q Will you state what you said to him and what he said to you? A I told the captain I would charter him for one round trip to Cuba with the option of one trip, option of another trip and option of a third trip; I told him that I would take him at same terms and conditions as per Cuneo's charter party; I was to get 2½% address commissions and the time of charter to start when the stevedore started to put coal in the bunkers.

"Q What was said, if anything, about notice to the captain if you desired the vessel for another trip? A If I was to avail myself of the option of another trip, I was to telegraph him at Baracoa, Cuba."

The latter is corroborated by his bookkeeper and there is so little difference between the master's version and that of the others that I think it may be accepted as true that no contract was made for more than the one trip and the respondent was entitled to relinquish the vessel when that was completed, which was October 1st at 4 P. M. She entered upon the charter August 29th at 6.15 A. M. and served through till the former date, excepting the time consumed for repairs in consequence of a breakdown of her machinery. On the way to Cuba, September 1st, about 11 A. M. a bolt in the feed pump broke. Time was consumed until 5 P. M. in repairing this break and she proceeded on the voyage. As this breakdown was less than 24 hours in duration, the charterer is not entitled to claim for it, but at 9.25 P. M. a more serious accident occurred, the opposite bolt to the former broken one giving away, which also disabled the first one, with the rods to the feed pump and connections, so that the steamer was completely incapacitated. She worked her way by means of steam from the donkey engine into Wilmington, North Carolina, where she repaired, consuming time until the 13th at 3 P. M., and proceeded on her voyage, reaching Baracoa September 18th at 5.30 A. M. The steamer earned hire from August 29th at 6:15 A. M. until September 1st at 9.25 P. M. and from September 13th at 3 P. M. until October 1st at 4 P. M. The respondent is entitled to deduct from this for the time consumed by the steamer in returning from Wilmington to the place where she broke down.

Save in respects herein pointed out the Cuneo charter expressed the contract between the parties and has been marked in evidence.

1. The question of fittings.

When the steamer was under a previous charter in the same trade, she had been fitted up below decks for the transportation of fruit by the charterer. When the respondent took her, she still had these fit-

tings in place and they were used by him with some additions which were made by him at Baracoa before the cargo was taken aboard. Those left over from the former charterer's use either belonged to him or to the steamer and the respondent acquired no title to them. When the former charterer relinquished the vessel, the owner apparently took possession of the fittings. The legal situation then apparently was that the first fittings had been abandoned to the owner, who accepted them. The transaction between the owner and the new charterer was without much regard to legal rights. Both seemed to assume that title to all the fittings, including those put in by the former charterer and the additions made by the respondent, was not in the owner. It seems that such fittings should have been supplied by the owner. Dene Steam Shipping Co., Ltd. v. Tweedie Trading Co. (D. C.) 133 Fed. 589; Tweedie Trading Co. v. Dene Steam Shipping Co., Ltd. (D. C.) 140 Fed. 779, affirmed 143 Fed. 854, 74 C. C. A. 606. The charter provisions in those cases were not as explicit as they are here. The charter under which the steamer was working contained this clause:

"11. * * * That the steamer shall be provided with loose planks, 2 to 2½ inches thick, to make a platform or deck, all through the vessel's hold, and also provided with beams for such temporary platform or deck to rest on, building the same strong enough to hold tiers of fruit."

The parties, however, depended rather upon the testimony than their charter rights. It was contended by the owner that on account of the refusal of the charterer to remove the fittings, the vessel was constructively in his possession until the 17th of October, when the owner undertook to remove them, after notice to the charterer that he would be held liable for the continued hire. The charterer's claim of a custom to leave fruit fittings is not sustained but otherwise the testimony rather tends to sustain the charterer's view, but in any event, I have no doubt that the owner was not entitled to continue the hire while he was deciding what to do about the fittings. No hire should be allowed after the first of October.

2. The question of commissions.

It appears that the respondent's right to recover 2½ per cent address commission was recognized by the agents of the steamer when the first payment of hire was made and the same percentage should be deducted from any further allowance of hire.

3. The question of breakdown.

This has been hereinbefore considered and nothing more need be said.

4. The value of coal used during breakdown.

This has not been discussed here and may be considered and determined by the commissioner.

5. The claim of the cross libellant for loss arising from damage to fruit caused through the delay of the steamer in arriving at Baracoa owing to her breakdown.

This claim is based upon an allegation by the charterer that timely notice was not given him of the breakdown of the steamer and he consequently lost an opportunity to save the fruit he had ready for shipment by forwarding it on another steamer.

When the machinery of the steamer became disabled she started for Wilmington. En route there, the master sent the pilot ashore at Southport, North Carolina, with a telegram to the steamer's agents in New York, Bowring & Company, advising them of the steamer's condition and directing them to inform the charterer.. This they first attempted to do by telephone and one of the disputes in the case to which much testimony and discussion have been directed, was whether Bowring & Company did telephone or not. They have produced apparently reliable witnesses to show that the respondent's office was called up immediately upon receipt of the message and some one there advised of its contents. The identity of the alleged recipient was not established and the only person who was actually in the respondent's office, denied the receipt of the message. Conversing by telephone has in recent years become a recognized means of business communication. When the identity of what is called the antiphonal speaker is established and he is shown to have been the party or his agent, there can be little doubt of the propriety of admitting the conversation in evidence. See Greenleaf on Evidence, § 430q, p. 533; Wigmore on Evidence, § 669 (8); Jones on Telegraph and Telephone Companies, § 697. Here the identity of the person spoken with was not established conclusively and any presumption which might have arisen from the respondent's office having been called and responded to is overcome by the unqualified testimony of the one person in the office that no such message was received. I think that any claim of notice by telephone must be disregarded. The telephone was followed up by what was called a confirmatory letter, which was as follows:

"New York, Sept. 5, 1906.

Mr. M. S. Arrue, Bridge Street, New York.

Dear Sir:—S. S. DISA. We regret to have to advise you that we have just received telegraphic advices from Southport, North Carolina, that this steamer has put in there with machinery out of order, and is proceeding to Wilmington, North Carolina, for necessary repairs. We shall promptly advise you when we have any further advices.

We are                        Yours faithfully

Bowring & Company
L. L. Richards
Manager S. B. Dept.
Agents."

Instead of sending this letter by hand to the respondent, a few minutes distance away, it was mailed and postmarked "Sep 5, 6 P. M." and did not reach the respondent until the next morning at 10 o'clock. He contends that owing to the delay in advising him of the accident to the steamer, loss was suffered. Without waiving any rights to his claim for damages caused by neglect to notify him promptly of the breakdown of the steamer, he consented to use her further and she continued her voyage to Cuba.

My attention has not been called to any provision of the contract which imposed upon the libellant such a duty as is claimed here by the respondent. In section 5 it is said that: "Captain to report at charterers office at least once a day" but that obviously was only intended to be in force when the vessel should be in port and I find nothing imposing any obligation upon the master to immediately report a disaster at

sea. Of course there was a duty upon the libellant to let the charterer know of any accident which would interfere with his profitable use of the vessel. The master was to be furnished with instructions and sailing directions and that required a knowledge of her movements but it is quite a different thing from the duty claimed to have existed in this case. The respondent testified that he directed the master to call August 29th at 10 A. M. to sign the charter and receive sailing instructions but the master called earlier in the morning and not finding the respondent sailed without instructions, which the respondent was obliged to cable to Cuba and he notified his agent that the steamer would arrive there the next Tuesday, September 4th, and not to cut the fruit before that time. It was cut that day for delivery Wednesday the 5th. At this time the steamer was broken down and there was no probability of her reaching Baracoa for several days. If the respondent had known this, he might have done something to save the fruit. The steamer, however, was not able to communicate with the shore until September 4th, not in time to prevent, through New York, the cutting of the fruit, though perhaps in season to arrange for its forwarding by another steamer, but this is not clear enough to be made the basis of a claim for damages, which were doubtless due to the premature cutting of the fruit, which was the proximate cause of the loss.

It is doubtful, moreover, if any recovery could be had from the libellant. The case is very similar to Nine Thousand Bunches of Bananas, 55 Fed. 1003, 5 C. C. A. 386, where it was held that a cutting of bananas in the case of a breakdown and delay of the steamer Curlew, in this trade between Baltimore and Jamaica, was due to a premature cutting of the fruit. In that case, as here, there was a provision in the charter party for exemption of the steamer from liability due to an accident to the machinery and it was held that there could be no recovery for a loss arising from decay of the bananas.

There will be a decree for the original libellant, with an order of reference. The cross libel will be dismissed.